# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| PATRICE E. HOWARD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:12-CV-00161** |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Patrice E. Howard appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[2]  For the following reasons, the Commissioner's

decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Howard applied for DIB and SSI in February 2010, alleging disability from November

15, 2007.[3]  (Tr. 11, 154-64.)  Her claim was denied initially and upon reconsideration (Tr. 91-98,

101-06), and Howard requested an administrative hearing (Tr. 107-08).  Administrative Law

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013 (Reply Br. 1 n.1).  As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue.  FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge.  (Docket # 12); *see* 28 U.S.C. § 636(c).

[3] Howard also applied for DIB and SSI two years before, alleging the same onset date (Tr. 147-53), but these claims were denied initially (Tr. 87-90) and apparently never appealed.

Judge ("ALJ") Warnecke Miller conducted a hearing on August 18, 2011, at which Howard, who was represented by counsel; Libbey Culley, Howard's friend; and a vocational expert ("VE") testified. (Tr. 11, 30-80.)

On September 12, 2011, the ALJ rendered an unfavorable decision to Howard, concluding that she was not disabled because she could perform her past relevant work as a box maker as well as a significant number of other jobs in the national economy despite the limitations caused by her impairments. (Tr. 11-23.) The Appeals Council denied Howard's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.)

Howard filed a complaint with this Court on May 23, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) Howard's sole argument on appeal is that the ALJ improperly evaluated the opinion of her treating physician, Dr. Julie Chao. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 13-15.)

## II. FACTUAL BACKGROUND[4]

### A. Background

At the time of the ALJ's decision, Howard was fifty years old (*see* Tr. 154), had a high school education consisting of special education classes (Tr. 36, 55), and had previously worked as a kitchen worker, box maker, auto assembler, janitor, caretaker, and machine tender (Tr. 287; *see* Tr. 38-45, 68). Howard alleges that she became disabled as of November 15, 2007, due to minor disk bulging at L4-L5, mild chondromalacia of the patellofemoral joint and medial joint compartment of the right knee, migraine headaches, chronic pain syndrome, generalized anxiety disorder, depression, mild distal lumbar spondylosis, high blood pressure, obesity, sacroiliitis,

---

[4] In the interest of brevity, this Opinion recounts only the portions of the 498-page administrative record necessary to the decision.

facet arthropathy, L5 radiculopathy, hypertension, and mild degenerative changes of the lumbar spine. (Opening Br. 2.)

## B. Howard's Testimony at the Hearing

At the hearing, Howard testified that she last worked in 2007 as a box maker, a full-time, sit-down position she held for a few months until she discovered her niece dead and became too depressed to return to work. (Tr. 37-39.) She represented that she sometimes needed to stand during this job because she could not sit for a long time and that she missed work three days a week due to her legs and back. (Tr. 53-54, 57.) During the ALJ's questioning, Howard indicated that she would probably still be working at this job if she "had not had the issues in [her] life that caused [her] to quit" (Tr. 40); later, when questioned by her attorney, Howard stated that, despite her niece's death, she would have continued to miss two to three days of work per week. (Tr. 57.) Howard further reported that she worked full time as an auto assembler from 2004 to 2006, part time as a janitor in 2003 and 2004, full time as a caretaker in 2003, part time as a kitchen worker in 2002, and as a machine tender for three years before these jobs. (Tr. 40-45, 68.)

According to Howard, although her niece's death in 2007 initially prevented her from working, now she cannot work full time because she does not want to leave her house due to pain and stress. (Tr. 46-47.) Howard tries to get out of the house more, usually at the prompting of her friend, Libbey Culley; she estimated that she usually leaves the house with Ms. Culley about three times a month. (Tr. 47-48.)

Physically, Howard reported that she has pains that feel like being shocked in her lower back and right leg; these pains last for forty-five minutes and occur two or three times a day.

(Tr. 51.)  During these periods, she rubs her legs to relieve the pain, which helps only sometimes, and takes a hot bath twice a day.  (Tr. 51.)  Her physician, Dr. Julie Chao, prescribed her Soma for her muscles and Methadone for her pain, on which Howard confirmed she was doing well. (Tr. 49-50.)  Howard also has bad migraines, for which she has been prescribed medication.  (Tr. 50.)

Overall, Howard represented that she cannot sit or stand for long and that she sometimes has to be helped out of bed in the morning because her legs are so swollen she cannot stand.  (Tr. 48-49.)  Howard testified that the pain has gotten worse in the past two months.  (Tr. 51.)  Before her pain increased, Howard was able to shop with Ms. Culley "all the time," now she gets up and gets dressed in the morning and then just sits on the couch and watches television; she does not want to go anywhere and only will go out at Ms. Culley's urging.  (Tr. 52-53.)  Howard also indicated that she needs help to manage her finances, can sometimes make change with a calculator, and can read her mail, but does not always understand it.[5]  (Tr. 55-56.)

### C. Summary of the Relevant Medical Evidence

In February 2006, an MRI of Howard's lumbar spine revealed minor disc bulging at L4-L5 and no disc herniation.  (Tr. 295.)  An MRI of Howard's knee performed the same day showed mild chondromalacia of the patellofemoral joint and medial joint compartment, low grade injuries of the collateral ligaments at the femoral insertion sites, small patellofemoral joint effusion, and suprapatellar synovial plica.  (Tr. 296.)

Between these MRIs and Howard's alleged onset date, Howard was seen by her primary

---

[5] Ms. Culley, Howard's friend of 25 years, also testified at the hearing and essentially corroborated Howard's testimony.  (Tr. 58-65.)  She stated that Howard had a very hard time comprehending things she reads or written instructions, but indicated that she can follow oral or demonstrative instructions very well.  (Tr. 58, 60-61.)

care physician, Dr. George Merkle, several times for her chronic back pain. (Tr. 374, 376-377, 379-84.) In March 2007, after a fall at work, Dr. Merkle ordered an x-ray of Howard's back, which revealed mild distal lumbar spondylosis. (Tr. 335.) Dr. Merkle further noted in a March 2007 letter that although Howard had some underlying degenerative disc disease, "her symptoms [were] out of proportion to her known disease." (Tr. 378.) Dr. Merkle referred Howard to Dr. William Hedrick of the Centers for Pain Relief for chronic pain management (Tr. 374); during their first appointment in October, Dr. Hedrick placed her on several medications (Tr. 364).

In November 2007—after her alleged onset date—Howard returned to the Centers for Pain Relief; she rated her lower back pain as a ten out of ten, apparently when sitting. (Tr. 363.) Her medications were refilled, and she deferred interventional injections due to financial constraints. (Tr. 363.) The next month, Howard rated her lower back pain as a nine and described it as stabbing. (Tr. 362.) She was diagnosed with sacroiliitis, facet arthropathy, and L5 radiculopathy and scheduled for injections in February. (Tr. 362.) At her next appointment with Dr. Hedrick in February 2008, Howard indicated that she had fallen on the ice and reported sharp, ten-level pain and numbness that radiated down her legs. (Tr. 361.)

Howard had another appointment with Dr. Hedrick in March, reporting stabbing, nine-level pain. (Tr. 414.) She stated that her pain was constant and worse in the morning and as the day progressed; hot baths and prescription medications purportedly alleviated the pain. (Tr. 414.) Howard further indicated that bending, lifting, twisting, pushing, pulling, crawling, and stooping aggravated her pain. (Tr. 411.) Dr. Hedrick diagnosed her with bilateral sacroiliitis, depression, and anxiety disorder and recommended a bilateral steroid sacroiliac joint injection. (Tr. 414.) Howard also saw Dr. Hedrick in April and May of 2008. (Tr. 410-12.) In May, she

rated her pain as a ten and continued to describe it as stabbing and constant. (Tr. 410.) Dr. Hedrick added chronic back pain to her diagnoses. (Tr. 410.) He further noted that Howard would be scheduled for a bilateral steroid sacroiliac joint injection once she obtained insurance. (Tr. 411.) In her June visit with Dr. Hedrick, Howard rated her back pain as a nine. (Tr. 408.) The back injection was still being postponed until she became insured. (Tr. 408-09.)

Also in June 2008, Dr. Mark Burns performed a consultative physical exam of Howard. (Tr. 390-94.) Howard reported a more than 20-year history of low back pain without any specific injury or trauma and denied having physical therapy, epidural injections, or a neurosurgical evaluation. (Tr. 390.) She stated that she continued to have worsening back pain that persisted throughout the day; she described it as a sharp, radiating pain that caused numbness in both legs. (Tr. 390.) Howard further represented that bending, twisting, turning, and prolonged sitting, standing, and walking exacerbated her symptoms, while rest and heat relieved them. (Tr. 390.) Dr. Burns noted that Howard's physical exam was within normal limits, that her orthopedic exam was without limitation, and that she had normal gait and station without any evidence of motor dysfunction, sensory loss, or reflex abnormality. (Tr. 392.) Ultimately, he opined that Howard could perform activities involving sitting, standing, moving about, lifting, carrying, handling objects, hearing, seeing, speaking, and traveling. (Tr. 392.)

The following month, Dr. Jason Earnest, a state agency physician, reviewed Howard's file, finding the evidence relatively normal and concluding that her alleged limitations were not credible and that her impairments were non-severe. (Tr. 395.)

Later on in July, Howard returned to Dr. Hedrick, complaining of nine-level pain. (Tr. 406.) On physical exam, she was positive for lumbar facet tenderness bilateral and had pain with

extension, flexion, lateral bending, and lateral rotation. (Tr. 406.) Howard had applied for insurance, and Dr. Hedrick noted the importance of either obtaining insurance or arranging for payments for interventional injections as this was "an integral part of pain management." (Tr. 407.) In August, Howard rated her back pain as an eight and also reported seven-level pain in her right knee that was stabbing and felt like pins and needles; hot baths and prescription medications alleviated this pain, while climbing stairs aggravated it. (Tr. 404.) Dr. Hedrick offered her a steroid knee injection, but she declined. (Tr. 405.) By her September appointment with Dr. Hedrick, Howard's back pain was a six and her knee pain was unchanged; she again declined a knee injection. (Tr. 402.) She reported that she had panic attacks at times and requested something for anxiety; Dr. Hedrick prescribed her Klonopin. (Tr. 402-03.)

In October 2008, Howard's back pain was still a six, but her right knee pain had decreased to a five; she indicated that Klonopin was working well for her panic attacks. (Tr. 400.) Dr. Hedrick added right knee arthralgia to her diagnoses. (Tr. 400.) Howard next saw Dr. Hedrick at the end of October, complaining of eight-level back pain and five-level right knee pain. (Tr. 398.) By her November appointment, Howard's right knee pain had increased to a nine; her back pain was still an eight. (Tr. 396.) Dr. Hedrick observed crepitis and synovial thickening in her knee, but noted that she had full range of motion and normal extremities. (Tr. 396.) Howard deferred a right knee injection until she obtained insurance. (Tr. 396.)

Eight months later, in July 2009, Howard saw Dr. Phillip Aaron complaining of nerve problems, chest pains, and left arm numbness. (Tr. 460.) His assessment noted anxiety and bad pain. (Tr. 460.) Howard returned to Dr. Aaron the following month, reporting right knee pain. (Tr. 459.) Dr. Aaron added right knee pain, fatigue, and obesity to his assessment. (Tr. 459.)

Howard was seen again in September for a weight check.  (Tr. 456.)

In April 2010, Howard underwent a consultative psychological evaluation performed by Dr. Russell Coulter-Kern.  (Tr. 425-28.)  Howard reported that she felt down at times and that she still had nightmares about finding her niece dead three years ago, but that she slept well when she took Soma to help her leg pain.  (Tr. 425.)  As for her activities, Howard stated that she could cook simple things, manage her money, do her laundry, and clean on her own, but that she had trouble standing back up after kneeling and that vacuuming hurt her back and legs.  (Tr. 426.)  On a typical day, Howard laid in bed for a little bit because her body was stiff and then made a simple breakfast and watched TV or went outside, sometimes helping her sister around the yard; her sister fixed dinner, and Howard helped do the dishes.  (Tr. 426.)  Dr. Coulter-Kern observed that Howard made appropriately focused eye contact, that her speech was normal, and that her thought processes were logical and consistent.  (Tr. 426.)  He ultimately found that Howard had very poor mental control, concluded that she was in the borderline to low average range of intellectual functioning, diagnosed her with depressive disorder, NOS; degenerative disc disease; knee arthritis; high blood pressure; and migraines, and assigned her a current Global Assessment of Functioning ("GAF") of 55.[6]  (Tr. 428.)

The next month, May 2010, Dr. Sayed Wahezi performed a consultative physical exam of Howard based on her allegations of low back pain/degenerative disk disease, bilateral knee arthritis, high blood pressure, migraines, and depression.  (Tr. 429-33.)  Howard described her

---

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*

low back pain as constant, dull, achy, and right-sided, stating that it radiated to her right posterior knee and worsened with standing more than twenty minutes. (Tr. 429.) As to her bilateral knee arthritis, Howard represented that she had morning stiffness for about a half hour and that the pain was stabbing and worsened when standing for more than twenty minutes. (Tr. 429.) She reported that she could dress and feed herself, stand for five minutes at a time, stand for about thirty minutes in an eight-hour period, walk a quarter of a block, sit for twenty-five minutes, lift less than eight pounds, and drive a car for two minutes secondary to pain limitations. (Tr. 429.) Howard also stated that she could shop, mop, walk stairs, vacuum, mow grass, cook, and do dishes, but then stated that she could *not* mop because of pain. (Tr. 429.) In the end, Dr. Wahezi concluded that Howard's physical exam did not demonstrate functional limitations. (Tr. 431.)

Later on that month, Dr. A. Dobson, a state agency physician, reviewed the evidence and concluded that Howard's physical impairments were not severe. (Tr. 434.) A second state agency physician later affirmed this assessment. (Tr. 452.) Also in May, Dr. William Shipley, a state agency psychologist, determined that Howard did not have a severe mental impairment (Tr. 435), a conclusion a second state agency psychologist later affirmed (Tr. 451).

In September of 2010, Howard began seeing Dr. Julie Chao at the Pain Center for her low back pain. (Tr. 491-94.) She rated her pain severity as a nine out of ten and described it as constant, deep, sharp, and shooting; an associated symptom of her pain was numbness in her right leg and burning at the bottom of her right hip. (Tr. 491.) Howard stated that the pain worsened with standing, walking, and weather changes; improved with medications and hot showers; and radiated into her right leg, causing intermittent pain and weakness and numbness in

her right leg and right foot.  (Tr. 491.)  On physical exam, Howard was positive for tender points in her back and pain in her right hip and right leg; she also had diffuse tenderness in her lower back and a slight limp in her right leg.  (Tr. 488.)  Dr. Chao's impressions were of back pain with radiculopathy, knee pain, hypertension, obesity, and anxiety/depression.  (Tr. 494.)

An x-ray performed of Howard's lumbar spine in October revealed mild degenerative changes, but no evidence of acute bony injuries.  (Tr. 461.)  Several days later, Howard returned to Dr. Chao, reporting that her pain level had decreased to a seven.  (Tr. 485.)  On physical exam, she had tender points in her lower back, but Dr. Chao noted that the diffuse pain was not as bad as the last visit and that her range of motion had improved.  (Tr. 485.)  Her right hip and leg were still positive for pain, but her gait was normal.  (Tr. 485.)  Dr. Chao diagnosed her with low back pain, lumbar radiculopathy, degenerative disc disease lumbar, limb pain, sciatica, and knee pain.  (Tr. 486.)  Howard indicated that, overall, her medications were helping.  (Tr. 487.)

Howard saw Dr. Chao again in January 2011, complaining of eight-level constant pain in her lower back and legs.  (Tr. 482.)  Her back still showed tender points on exam and her right hip and leg continued to be positive for pain; her gait was again normal.  (Tr. 482.)  In February, Howard's pain was unchanged and she still had tender points in her back and pain in her right hip and leg; recently, her right lower leg had begun swelling.  (Tr. 479.)  At her March appointment with Dr. Chao, her pain was still constant and of eight-level severity; Howard reported that her right ankle was still hurting and that she was experiencing more pain recently.  (Tr. 476.)  The following month, Howard's ankle was still swollen and painful, but she rated her pain as only a five to six.  (Tr. 473.)  Although she continued to have tender points in her back and right hip and leg pain, her gait was normal.  (Tr. 473.)  By her May visit with Dr. Chao,

Howard's pain was a four to five, she was able to do more yard work, and her gait was still normal despite tender points in her back and right hip and leg pain. (Tr. 470.) In June, Howard's reported pain level had increased to an eight and a half in her lower back and right knee. (Tr. 467.) Howard further complained of migraine headaches. (Tr. 467.) Howard returned to Dr. Chao in July 2011, reporting nine-level pain that was apparently located in her tail bone. (Tr. 464.) Howard was given information about a spinal cord stimulator and baclofen pump. (Tr. 466.)

Howard also saw Dr. John Mathew in July 2011, identifying her current problems as depression, gastro-esophageal reflux disease, hypertension, migraines, and stroke. (Tr. 462-63.) She stated that she saw Dr. Chao for pain management for her lower back pain and that she took Soma and Methadone with some relief. (Tr. 462.)

At the end of July, Dr. Chao completed a "Medical Source Statement" on Howard. (Tr. 495-98.) She diagnosed Howard with lumbar radiculopathy, mild degenerative arthritis, and sciatica and described her symptoms as diffuse pain in her back and down to both legs, though worse to the right; numbness in and some weakness to her right leg; and a burning sensation at the bottom of the right hip. (Tr. 495.) Dr. Chao noted that Howard's pain was rated a nine out of ten; was deep, sharp, shooting, and constant; present daily; and increased with weather changes, prolonged postures, standing, and walking. (Tr. 495.) Dr. Chao identified the clinical findings and objective signs supporting her diagnoses as pain and decreased range of motion in Howard's back, pain in her right leg, positive straight leg raising test, some swelling of the right leg, and decreased sensation in her right leg. (Tr. 496.) Dr. Chao concluded that Howard could walk only three city blocks, sit for one to two hours at a time, stand for thirty to forty-five

minutes at a time, and sit and stand/walk for less than two hours in an eight-hour work day.  She

further opined that Howard could work for only ten hours per week and that she would miss

more than three days of work per month as a result of her impairments or treatment.  (Tr. 497-

98.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not

---

[7] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On September 12, 2011, the ALJ rendered the decision that ultimately became the Commissioner's final decision.  (Tr. 11-23.)  He found at step one of the five-step analysis that Howard had not engaged in substantial gainful activity since her alleged onset date, and, at step two, that Howard had the following severe impairments: disc bulge at L4-L5, degenerative changes to the right knee, lumbar radiculopathy, degenerative changes to the lumbar spine, mild degenerative arthritis, sciatica, obesity, borderline to low average range of intellectual functioning, and depression.  (Tr. 13.)  At step three, the ALJ determined that Howard's impairment or combination of impairments did not meet or medically equal a listing.  (Tr. 13-17.)  Before proceeding to step four, the ALJ determined that Howard's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand or walk 6 hours in an 8-hour workday, and sit 6 hours of an [8]-hour workday.  She cannot climb ladders, ropes, or scaffolds.  She can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl.  Based upon a moderate difficulty in concentration, she cannot understand, remember, or carry out detailed instructions or tolerate sudden or unpredictable work place changes, and she requires a job that provides oral, or hands on, demonstration of work related duties.

(Tr. 17, 19.)

Based on this RFC and the VE's testimony,  the ALJ found at step four that Howard was able to perform her past relevant work as a box maker.  (Tr. 22.)  Nonetheless, the ALJ continued on to step five, finding that Howard could also perform a significant number of other

14

jobs in the economy despite her impairments, including cleaner, assembler, and inspector.  (Tr. 22.)  Thus, Howard's claims for DIB and SSI were denied.  (Tr. 23.)

### C. The ALJ's Consideration of Dr. Chao's Opinion Is Supported by Substantial Evidence and Does Not Contain Legal Error

Howard contends that the ALJ insufficiently articulated his explanation for discounting the opinion of her treating physician, Dr. Julie Chao, and erred by failing to discuss the "checklist factors" in assessing Dr. Chao's opinion.  (*See* Opening Br. 14.)  Both of Howard's arguments, however, are ultimately unavailing.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of [her] greater familiarity with the claimant's conditions and circumstances."  *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  This principle, however, is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).  The

Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

To review, in July 2011, after seeing Howard nine times since September 2010 (Tr. 464-94), Dr. Chao completed a "Medical Source Statement" in which she opined that Howard could walk only three city blocks, sit for one to two hours at a time, stand for thirty to forty-five minutes at a time, sit and stand/walk for less than two hours in an eight-hour work day, and work only ten hours a week (Tr. 497). She further concluded that Howard would miss more than three days of work per month (Tr. 498), which would, according to the VE's testimony, exceed the acceptable level of absenteeism for competitive employment (*see* Tr. 72-73). After recounting each of Howard's nine visits with Dr. Chao (Tr. 18 (where the third and fourth full paragraphs specifically mention each visit with Dr. Chao between September 2010 and July 2011)) as well as the other medical evidence in the record, including MRI and x-ray findings (Tr. 17), the ALJ assigned "little weight" to Dr. Chao's opinion because it was "not supported by objective medical evidence as outlined in the entirety of this opinion." (Tr. 22.)

Howard asserts that this explanation for discounting Dr. Chao's opinion is insufficient because it does not meet the level of specificity required by the regulations and case law. (Opening Br. 14.) Beyond giving "good reasons" for the weight assigned to a treating physician's opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), the ALJ's reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," SSR 96-2p, 1996 WL 374188, at *5. Here, the weight the ALJ assigned to Dr. Chao's opinion and the reasons for that

weight are sufficiently clear; the ALJ gave Dr. Chao's opinion "little weight" *because* it was not supported by the objective medical evidence.  (Tr. 22.)

At the same time, however, an ALJ can discount a treating physician's opinion only for reasons supported by substantial evidence in the record.  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Howard argues that substantial evidence does not support the ALJ's discounting of Dr. Chao's opinion because the ALJ's explanation was only one sentence and did not reference any other medical opinion.  (Opening Br. 14.)  But Howard reads the ALJ's decision too narrowly.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) ("[W]e read the ALJ's decision as a whole and with common sense." (citations ommited)); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

Before discounting Dr. Chao's opinion because it was not supported by objective medical evidence—which the ALJ is entitled to do, *see Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)—the ALJ recounted findings from MRIs and x-rays of Howard's back and right knee, her medical records from Dr. Hedrick and Dr. Aaron, the opinions of the consultative examiners, each of her nine visits with Dr. Chao, and her own testimony and reports.  (Tr. 17-21.)  These MRI and x-ray findings showed only mild or minor problems (*see* Tr. 295-96 (2006 MRI showing minor disc bulging at L4-L5 and 2006 x-ray showing mild knee problems), 335 (2007 x-ray showing mild distal lumbar spondylosis), 461 (2010 x-ray showing mild degenerative changes in the lumbar spine)), results which the ALJ explicitly noted (Tr. 17-18).  When explaining the RFC he assigned Howard, the ALJ noted some of the results from

Howard's physical examinations, including Dr. Chao's observations that Howard's gait was normal. (Tr. 21; *see* Tr. 470, 473, 482, 485.) The ALJ then concluded that "[t]here is nothing at present . . . to support the claimant's supported limitations." (Tr. 21.) And, in weighing the medical evidence, the ALJ gave significant weight to Dr. Burns's opinion that Howard could perform activities involving sitting, standing, moving about, carrying, handling objects, hearing, seeing, speaking, and traveling, but little weight to the opinions of Dr. Chao and the state agency physicians (the latter of which found Howard's impairments non-severe). (Tr. 21-22.)

Howard relies on *Clifford*, 227 F.3d at 870, for the proposition that the ALJ may not "play doctor" by giving little weight to a treating physician's opinion due to a lack of medical evidence without citing a medical report or opinion that contradicts that opinion. (Opening Br. 14.) But Howard's interpretation of *Clifford* is too narrow; in *Clifford*, the Seventh Circuit stated that "an ALJ must not substitute his own judgment for a physician's opinion *without relying on other medical evidence* or authority in the record." *Clifford*, 227 F.3d at 870 (emphasis added) (citation omitted). In the instant case, the ALJ *did* rely on other medical evidence in the record in discounting Dr. Chao's opinion—finding that the objective medical evidence in the record did not support her opinion.

Moreover, the ALJ assigned greater weight to the opinion of Dr. Burns, a consultative examiner, than to that of Dr. Chao, a treating physician. An ALJ may discount a treating physician's medical opinion if it "is inconsistent with the opinion of a consulting physician . . . as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (internal quotations and citations omitted)). Although the ALJ did not

cite to Dr. Burns's consultative opinion as a reason for discounting Dr. Chao's opinion, Dr. Chao's restrictive opinion limiting Howard to walking only three city blocks, sitting for one to two hours at a time, standing for thirty to forty-five minutes at a time, and sitting and standing/walking for less than two hours in an eight-hour work day is inconsistent with Dr. Burns's consultative report, specifically his findings that Howard's physical exam was within normal limits and orthopedic exam was without limitation and his opinion that Howard could perform activities involving sitting, standing, and moving about, among others, apparently without restriction.

"When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon*, 270 F.3d at 1178. Therefore, deciding whether to assign more weight to Dr. Burns's or Dr. Chao's opinion was the ALJ's responsibility, and he was entitled to discount Dr. Chao's opinion as long as he minimally articulated his reasons for doing so. *See Schmidt*, 496 F.3d at 842. And the ALJ *did* provide an adequate explanation for giving more weight to Dr. Burns's opinion: Dr. Chao's opinion was not supported by the objective medical evidence, while Dr. Burns's opinion was "consistent with the medical record" (Tr. 21-22). *See Skarbek*, 390 F.3d at 503 (finding ALJ's statement that the treating source's opinion "was not well-supported by medical evidence" constituted an "adequate explanation").

Of course, as a general matter, "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," and an ALJ is entitled to rely upon their opinions. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i); *see Dixon*, 270 F.3d at 1177

(acknowledging that a consulting physician's opinion may offer "the advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43 (7th Cir. 2000) (emphasizing that a consulting physician may bring expertise and knowledge of similar cases). Therefore, the ALJ was permitted to assign "significant weight" to Dr. Burns's opinion, which he found consistent with the medical record, and "little weight" to Dr. Chao's opinion, which he concluded was *not* supported by objective medical evidence. And substantial evidence in the record, such as mild and minor MRI and x-ray findings and Dr. Chao's findings of normal gait despite positive pain examinations, supports the ALJ's conclusion that Dr. Chao's restrictive opinion was not supported by objective medical evidence. "[I]n, the end, it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books*, 91 F.3d 972, 979 (7th Cir. 1996) (citation omitted and internal quotation marks omitted); *accord Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). And it is not this Court's role to reweigh the evidence. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

Furthermore, Dr. Chao was not only the medical source who assigned Howard the most extreme limitations, but she was also the *only* medical source who opined that Howard was functionally limited in her physical activities *at all*. To that end, all of the non-examining state agency physicians concluded that Howard's physical impairments were not severe (Tr. 395 (Dr. Earnest's July 2008 conclusion), 434 (Dr. Dobson's May 2010 conclusion), 452 (September

2010 affirmation)), and the two consultative physicians who performed physical exams of Howard found her either functionally unlimited (Tr. 431 (Dr. Wahezi's May 2010 opinion that Howard's physical exam did not demonstrate functional limitations)) or capable of performing a number of activities without assigning any limitations (Tr. 392 (Dr. Burns's June 2008 opinion)). As such, Dr. Chao's restrictive opinion was the outlier of the medical opinions, and the ALJ was justified in discounting it. *See Smith v. Astrue*, No. 09-cv-0564-MJR, 2010 WL 2680656, at *10 (S.D. Ill. July 4, 2010) (finding that the ALJ had sufficient cause to discount an examining physician's outlier opinion); *cf Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) (unpublished) (holding that the ALJ's RFC was not supported by substantial evidence when he *relied* on the one outlier opinion in the record to deny benefits).

Not to be deterred, Howard argues that even though the ALJ mentioned most of Dr. Chao's findings, he did not explain why her findings did not support her opinions on limitations. (Reply Br. 2.)  But the fact that the ALJ could have done a better job of discounting Dr. Chao's opinion does not mean what he did do was inadequate; perfection is not necessary. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").  Instead, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).  Here, the ALJ considered the important evidence, explicitly recounting many of Dr. Chao's findings, the MRI and x-ray findings, and the other medical opinions.  But he decided to assign little weight to Dr. Chao's restrictive opinion because it was not supported by the

21

objective medical evidence and significant weight to Dr. Burns's consultative opinion because it was consistent with the medical record. As such, the Court can trace the ALJ's rationale for discounting Dr. Chao's opinion, and since that determination is supported by substantial evidence, the ALJ has done enough here. *See Liskowitz v. Astrue*, 559 F.3d 736, 746 (7th Cir. 2009) (holding that, while it would have been better if the ALJ gave a "better-reasoned basis" for rejecting a treating physician's opinion, the ALJ's decision was nonetheless supported by substantial evidence).

Next, Howard asserts that the ALJ committed legal error at step three by not explicitly addressing the checklist of factors under 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) in considering Dr. Chao's opinion as Howard's treating physician. (Opening Br. 14-15.) But an ALJ's "decision need only include 'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (unpublished)); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is no "*articulation* requirement for each and every factor" and that "ALJs are not required to produce prolix opinions containing checklists from all of the regulations" (emphasis in original)). Therefore, it is enough if the ALJ generally covers the ground of 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) and provides "good reasons" for the weight assigned to the treating physician's opinion. *See Hanson*, 2011 WL 1356946, at *12; *accord*

*Oldham*, 509 F.3d at 1258 (noting that the ALJ provided good reasons for the weight he gave to the treating sources' opinion and concluding that "[n]othing more was required in this case").

Here, the ALJ adequately considered the checklist factors as they applied to Dr. Chao's opinion. He noted that Dr. Chao was Howard's treating physician twice (Tr. 18, 22) and explicitly recounted each of Howard's nine visits with Dr. Chao from September 2010 through July 2011, including many of Dr. Chao's observations upon her physical examinations of Howard and her diagnoses (Tr. 18), taking into account the nature and extent of her relationship with Howard. *See* 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii). Although the ALJ did not translate Howard visits into a numerical frequency—roughly a visit every four and a half weeks for ten months—the ALJ certainly *considered* the length and frequency of Howard's treating relationship with Dr. Chao when recounting these nine visits. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). And, in explaining the weight he assigned to Dr. Chao's opinion, the ALJ touched on both the supportability of her opinion—finding that it was *not* supported by objective medical evidence—and the consistency between her opinion and the record as a whole—implicitly noting the inconsistency between her opinion and the objective medical evidence as well as between her opinion and that of Dr. Burns, to which the ALJ assigned more weight. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4).

Despite the ALJ's thorough consideration of these factors, Howard argues that the ALJ should have more carefully and completely evaluated these factors in assigning weight to Dr. Chao's opinion. (Reply Br. 5.) She relies on *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010), arguing that "[s]everal factors supported the conclusion that the treating physician's opinion should be given great weight." (Reply Br. 5.) But *Campbell* is distinguishable from

Howard's case.  In *Campbell*, 627 F.3d at 308-09, the ALJ did not explicitly address the checklist factors when considering a treating psychiatrist's opinion; he instead relied on the opinion of a non-examining medical expert whose testimony showed an unfamiliarity with the claimant's current condition and the opinions of a state agency psychiatrist and psychologist who reviewed only part of the claimant's psychiatric records.  The Seventh Circuit remanded the case because the ALJ did not adequately explain why the reviewers' opinions were entitled to greater weight than those of the claimant's treating psychiatrist.  *Id.* at 309.

But the concerns that were present in *Campbell* are not present here.   First, as already explained, not only did the ALJ consider the checklist factors in assessing Dr. Chao's opinion, but there is also nothing suggesting that Dr. Burns, the consultative physician whose opinion the ALJ assigned "significant weight" to (Tr. 21), was unfamiliar with Howard's condition.  Moreover, rather than relying on the opinions of the state agency physicians who opined that Howard did not suffer from a severe impairment (*see* Tr. 395, 434, 452), the ALJ assigned their opinions little weight "based on newly filed medical evidence" (Tr. 22).  As such, unlike in *Campbell*, the ALJ did not assign greater weight to the opinions of non-examining state agency physicians that were based on only part of the records, but rather discounted those opinions based on more recent medical evidence.  Thus, *Campbell* does not support a remand based on Howard's second challenge to the ALJ's discounting of Dr. Chao's opinion.

In the end, Howard's arguments amount simply to a plea to reweigh the medical source evidence in the hope that it will come out in her favor this time, which the Court cannot do.  *See Cannon*, 213 F.3d at 974.  The ALJ considered all the medical opinions of record and adequately articulated his discounting of Dr. Chao's opinion—and sufficiently considered the checklist

factors in doing so—allowing this Court to trace the path of his reasoning and thereby avoiding a remand.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Howard.

SO ORDERED.

Enter for this 29th day of April, 2013.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge